**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **LEXINGTON INSURANCE CO.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 4:10cv2143 TCM** |
| | ) | |
| **INTEGRITY LAND TITLE CO., INC., and** | ) | |
| **INTEGRITY DISBURSING, L.L.C.,** | ) | |
| | ) | |
| **Defendants,** | ) | |
| | ) | |
| **vs.** | ) | |
| | ) | |
| **FIDELITY NATIONAL TITLE, INC.,** | ) | |
| **as successor by merger to Lawyers** | ) | |
| **Title Insurance Corporation and** | ) | |
| **Commonwealth Land Title Insurance Co.,** | ) | |
| | ) | |
| **Intervenor Defendant.** | ) | |

## MEMORANDUM AND ORDER

This insurance dispute is before the Court[1] on opposing motions for summary

judgment: one filed by plaintiff, Lexington Insurance Company ("Lexington"); one filed by

the intervenor, Fidelity National Title, Inc. ("Fidelity"), as successor by merger to Lawyers

Title Insurance Corporation ("Lawyers Title") and Commonwealth Land Title Insurance

Company ("Commonwealth"); and one filed by Integrity Land Title Co, Inc. ("Integrity

Land"), and Integrity Disbursing, L.L.C. ("Integrity Disbursing"), adopting the motion and

supporting memorandum of Fidelity.

---

[1]The case is before the undersigned United States Magistrate Judge by written consent of
the parties.  See 28 U.S.C. § 636(c).

## **Background**

This action began with the filing of a two-count complaint for declaratory judgment against Integrity Land and Integrity Disbursing asking that the Court find that Lexington (1) has no duty to defend or cover Integrity Land "for claims made and damages sought" in (a) an action filed by Contemporary Flooring and Design, Inc. ("Contemporary Flooring") arising from the nonpayment of work it performed pursuant to contracts with Bower & Bailey, LLC ("Bower & Bailey") and (b) an action filed by Commonwealth arising out of title insurance policies it issued for residential sales transactions, and (2) has no duty to defend or cover Integrity Land for claims made in (a) litigation brought by David and Rebecca Talley arising from Integrity Land's role in connection with the sale of real property, (b) litigation brought by Gary and Esther Gassen arising from Integrity Land's role in connection with the sale of real property, and (c) litigation brought by Lawyers Title for indemnification and breach of an agency agreement arising from the Talley and Gassen claims.

In its complaint in intervention, Fidelity seeks the opposite – a declaratory judgment that Lexington does have a duty to cover the claims against Integrity Land and Integrity Disbursing in the litigation cited by Lexington.  Fidelity alleged in its complaint that it has a legally protectable interest in Lexington's suit "[a]s a third-party beneficiary to the [errors and omissions] policy."  (Int. Compl. ¶ 44, ECF No. 22.)

The underlying litigation, the Lexington policies, and Lexington's decision regarding coverage for the litigation under those policies are described below.

- 2 -

The Litigation: Tally and Gassen Claims.  In October 2005, David and Rebecca Talley ("the Talleys") purchased real estate in the Silver Moon Resort at the Lake of the Ozarks.  (Compl. Ex. C at 4, 16-30, ECF No. 1-3.)  The real estate was to be conveyed in two parcels.  (Id. at 3.)  Integrity Land prepared the title commitments and, acting as agent for Lawyers Title, issued the title insurance policies for each parcel.  (Id.)  The title insurance policies included in the legal description of each parcel that the property lay "above the 660 contour of the Lake of the Ozarks."  (Id. at 36, 43-44.)  Condemnation judgments entered in 1931 established Ameren Union Electric as the owner of the land up to the 665 foot contour line of the Lake.  (Id. at 5.)  The title commitments did not disclose this ownership.  (Id.)  Nor did the title commitments disclose the claim of another group in a portion of the second parcel.  (Id. at 6.)

In December 2008, the Talleys filed a six-count action in the Morgan County Circuit Court[2] against the sellers of the two parcels, Lawyers Title, and Integrity Land.  (Id. at 2.) Integrity Land was named in two counts, one for negligence and one for negligent misrepresentation; Lawyers Title was named in one count, for vexatious breach of insurance contract.  (Id. at 11-15.)  Lexington denied coverage and defense to Integrity Land on the grounds that the alleged wrongful acts had occurred before the retroactive date of the policy. (Master Stat. of Uncontroverted Material Facts Ex. N, ECF No. 49-8.)

---

[2]Unless otherwise noted, all county circuit courts cited are in Missouri.

In October 2006, Gary and Esther Gassen purchased from the Talleys a tract of land in the Silver Moon Resort.  (Compl. Ex. D at 2-3, ECF No. 1-4.)  Integrity Land issued the title commitment and, acting as Lawyers Title's agent, title insurance policy; Lawyers Title underwrote the policy.  (Id. at 2.)  The title commitment did not disclose Ameren's ownership in the portion of the property up to the 665 foot contour line of the Lake.  (Id. at 3.)  In August 2009, the Gassens filed a six-count action in Morgan County Circuit Court against the Talleys, Integrity Land, and Lawyers Title.  Integrity Land was named in two counts, one for negligence and one for negligent misrepresentation; Lawyers Title was named in two counts, one for breach of insurance contract and one for vexatious breach of insurance contract.  (Id. at 6-11.)

Eight months later, in April 2010, Bruce Bartlett, wrote Nancy Volonakis, a claims examiner for Lexington, on behalf of Integrity Land and requested that Lexington provide coverage for Integrity Land in the Gassens' suit.  (Master Stat. of Uncontroverted Material Facts Ex. 0, ECF No. 49-9.)  The Gassens' suit had been consolidated with the Talleys' suit and was set for trial in three weeks.[3]  See Gassen v. Talley, Case No. 09MG-CC00066 (Mo. Cir. Ct. Nov. 2, 2009) (found at https://www.courts.mo.gov/casenet/cases/searchDockets.do (last visited Jan. 23, 2012); Fidelity Stat. of Uncontroverted Material Facts ¶ 245).  Attached to the letter was a copy of the Gassens' petition.  (Master Stat. of Uncontroverted Material

---

[3]Also at issue was Lawyers Title cross-claims against Integrity Land for indemnification for losses caused by its failure to disclose and except the Ameren condemnation judgments "in and from the Talley and Gassen policies."  (Fidelity Stat. of Uncontroverted Material Facts ¶ 250.)

Facts Ex. 0, ECF No. 49-9.)  Bartlett explained that the Gassens' claim was related to one by the Talleys "in that the Gassen property was subdivided from the Talley property."  (Id. at 1.)  The Talley claim, Lexington's file number 683-251727, had been denied because the "alleged wrongful acts occurred during the dates of 10/14/05 through 10/31/05" and the Lexington policy was not in effect until May 23, 2006.[4]  (Id.)  The alleged wrongful acts at issue in the Gassens' claim were after the policy's effective date:  specifically, October 27, 2006, the date of the title search, through November 10, 2006, the closing date.  (Id.)  Bartlett did not recall Integrity Land receiving notice of the Gassen claim until the suit was filed.  (Master Stat. of Uncontroverted Material Facts Ex. J, Bartlett Dep. at 75,[5] ECF No. 49-4.)

Bartlett testified in his deposition that the title search performed when the Talleys purchased the property was updated for the Gassen purchase.  (Id. at 84-85.)  Otherwise, the Talley and Gassen title searches and commitments were separate transactions subject to separate charges; separate policies were issued.  (Id. at 84-85.)  Mark Dickhute, the corporate representative of Fidelity, testified in his deposition that underwriting standards did not allow title searchers "to use a previous owner search as a starter.  [T]hey're supposed to begin anew."  (Master Stat. of Uncontroverted Material Facts Ex. I, Dickhute Dep. at 95, ECF No.

___

[4]Indeed, Fidelity has agreed that the losses attributable to the Talleys are not covered by the Lexington policy.  (See Fidelity Mem. at 2-3, ECF No. 60.)  The Talley claim is therefore discussed only insofar as it affects the Gassen claim.

[5]Each of the depositions submitted are condensed transcripts with four pages of deposition on each exhibit page.  For ease of reference, the Court will cite to the deposition page and not to the exhibit page.

49-3.)  It was a common practice, however, for them to rely on what is characterized as a "starter policy."  (Id.)  A subsequent search cost as much as the first search.  (Id.)

Bartlett wrote again nine days later, on April 16.  (Master Stat. of Uncontroverted Material Facts Ex. Q, ECF No. 49-11.)  He advised Volonakis that a continued silence by Lexington on the Gassen's claim would be construed as a denial of coverage and defense.  (Id.)

In reply, Lexington's retained counsel wrote Bartlett denying coverage and defense.  (Master Stat. of Uncontroverted Material Facts Ex. S, ECF No. 49-13.)  The grounds for the denial were that the Gassen claim was not made until August 2009 – one month afer the policy period ended on July 15, 2009.  (Id. at 4.)  Additionally, counsel disagreed that the Gassen claim and Talley claim were related, having "ar[isen] out of two different lawsuits alleging two separate real estate transactions that involve two separate and distinct Wrongful Acts."  (Id. at 4.)  Also, aside from the relation-back question, notice of the Gassen claim was not made as soon as practicable, a requirement under the policy, and such notice, three weeks before trial, did not satisfy Integrity Land's burden under the policy to cooperate.  (Id. at 6.)

A few months later, in June, Lawyers Title, the Talleys, and the Gassens filed suit in St. Louis County Circuit Court against Integrity Land and Lexington ("the Lawyers Title suit").  (Compl. Ex. E, ECF No. 1-5.)  Integrity Land was alleged to have "failed to locate, identify and expressly except from coverage the Condemnation Judgments in the Talley Policies and the Gassen Policy."  (Id. at 5.)  Pursuant to their agency agreement, Lawyers Title had made a demand on Integrity Land for indemnification of the Talley and Gassen

claims.  (Id. at 6.)  In June 2009, Lexington, Integrity Land's errors and omissions insurance carrier, had denied coverage for the indemnification demand.  (Id.)  Lawyers Title thereafter entered into two settlement agreements:  one with the Talleys and one with the Gassens for $410,000.00.  (Id. at 6-7.)  Included in the ten-count suit were Lawyers Title's third-party beneficiary claims against Lexington for reimbursement of the monies it paid in settlement of the Talleys' and Gassens' claims (Counts III and VI, respectively).  (Id. at 10-12, 15-17.)

The next month, Bartlett wrote Volonakis requesting that Lexington provide coverage and a defense in the Lawyers Title suit.  (Master Stat. of Uncontroverted Material Facts Ex. T, ECF No. 49-14.)  In November 2010, this action was filed.

The Litigation:  Contemporary Flooring and Commonwealth Claims.  In March 2008, Contemporary Flooring filed suit in St. Charles Circuit Court against 81 defendants, including Integrity Land and Integrity Disbursing.  (Compl. Ex. B, ECF No. 1-2.)  Integrity Land was served the same month.  (Master Stat. of Uncontroverted Material Facts ¶ 54, ECF No. 49.)  Also in March, fifteen claims were filed with Integrity Land relating to the Bower & Bailey properties; those claims were forwarded to Commonwealth.  (Bartlett Dep. at 46, 53; Lexington Ex. EE, ECF No. 50-3.)  Bartlett knew then that liens were being filed against properties sold by Bower & Bailey.  (Bartlett Dep. at 49.)

The Contemporary Flooring suit had its genesis in work the company had performed for Bower & Bailey.  (Compl. Ex. B, ECF No. 1-12.)  Bower & Bailey did not pay for the work.  (Id. at 13.)  Subsequently, Contemporary Flooring filed a mechanic's lien against thirty-two parcels of real property on which it had performed the work.  (Id. at 12-13.)  The

named defendants included Bower & Bailey, the owners of the property, the lenders for the purchase of the property, and the entities named as trustees of the property. (Id.) Integrity Disbursing was named in its capacity as trustee for the lender for the purchase of certain lots of property at issue and against which Contemporary Flooring had placed a mechanic's lien. (Id. at 36-40, 102-06.) Contemporary Flooring asked in respect to those properties, as with all properties at issue, that judgment be entered finding its mechanic's lien binding, subjecting the property to that lien, and, if a judgment against Bower & Bailey for the amount of the lien plus fees and expenses not be satisfied, issuing an execution against the property and determining the rights of all persons claiming an interest therein. (Id. at 38-40, 104-06.)

Integrity Land was also named as a defendant in its capacity as a trustee for a lender for the purchase of certain lots of property at issue and against which Contemporary Flooring had placed a mechanic's lien. (Id. at 91-95) Similar relief was sought. (Id. at 93-95.)

Integrity Land acted as an escrow agent and title insuring agent for all the lots at issue in Contemporary Flooring's suit. (Master Stat. of Uncontroverted Material Facts Ex. J, Bartlett Dep. at 30, ECF No. 49-4.) As an escrow agent it received funds and disbursed them as instructed. (Id. at 33.) As a title insuring agent, it did the title searches and title commitments and sold title insurance policies. (Id.) The policies sold did not include any exception or exclusions for mechanics liens. (Pl.'s Stat. of Uncontroverted Material Facts ¶ 163, ECF No. 50.) The title searches and title commitments done by Integrity Land did not include any of the Contemporary Flooring liens. (Bartlett Dep. at 36.) Bartlett explained

- 8 -

that this was because they had not yet been recorded before the closing to the end buyer. (<u>Id.</u> at 35, 36.) A homeowner would get protection from liens recorded after closing by purchasing title insurance policies. (<u>Id.</u> at 35.) Dickhute testified that Integrity Land should have confirmed with the subcontractors of the general contractor that all of the subcontractors have been paid and, if not, how much was due. (Dickhute Dep. at 111, 141.) Indeed, Bartlett testified that Integrity Land would contact owners and contractors to determine if any contractors needed to be paid and, if they had reason to believe that a subcontractor was not being paid, would contact them. (Bartlett Dep. at 167.) Also, if an agent like Integrity Land received notice that subcontractors were not being paid in a project for which Integrity Land had performed work on other sales, it should be concerned that claims could be made against it and others and that its underwriter could be in trouble. (Dickhute Dep. at 115.)

When the Contemporary Flooring liens were filed, coverage under those policies was triggered. (Pl.'s Stat. of Uncontroverted Material Facts ¶ 164.) Commonwealth had issued such title insurance for Bower & Bailey lots. (<u>Id.</u> at 36.) It, now Fidelity, was liable to the insureds; Integrity Land was not. (Master Stat. of Uncontroverted Material Facts ¶ 4.)

The Contemporary Flooring liens totaled $2,340,881.28. (<u>Id.</u> at 173.)

Integrity Disbursing acted as a construction disbursing agent for Bower & Bailey. (<u>Id.</u> at 31-32.) In this role, it was acting as an escrow agent for the construction loans. (<u>Id.</u> at 33.) In such a role, Integrity Disbursing's typical agreement is that a general contractor provides them with a budget that the contractor has established with a bank; the contractor

then can request of Integrity Disbursing that funds be disbursed from the budget; Integrity Disbursing submits the request to the bank; the bank then seeks approval from the borrower for the disbursement; if approval is given, the bank provides the funds to Integrity Disbursing; Integrity Disbursing collects lien waivers from the various contractors. (Id. at 29.) The agreement also "typically provides that the general contractor can request those funds from the borrower." (Id.) Bower & Bailey was the original owner and general contractor for the lots at issue in the suit. (Id. at 31.) Integrity Disbursing's general practice was to require the president of the general contractor to sign an affidavit specifically averring that there were no unpaid liens and that Integrity Disbursing would be indemnified if there were. (Id. at 38-39.) Bower & Bailey represented such. (Id. at 38, 168.) Integrity Disbursing had not learned of the mechanic's liens at issue in the Contemporary Flooring litigation prior to the closings on the related properties. (Id. at 168.)

In March 2008, Integrity Land informed Commonwealth by e-mail that fifteen claims had been filed in relation to the Bower & Bailey properties. (Id. at 47, 53; Pl.'s Ex. EE, ECF No. 50-3.) Bartlett thought Bower & Bailey had closed their doors in April 2008. (Bartlett Dep. at 39.) That same month, Commonwealth directed Integrity Land to send all claims to its claims attorney. (Pl.'s Ex. FF, ECF No. 50-4.) Sixteen additional claims had then been filed. (Id.)

In February 2009, a claims examiner for Commonwealth wrote Bartlett about the Contemporary Flooring litigation, informing him that Commonwealth was administering more than 80 claims arising from the mechanic's liens at issue in the Contemporary Flooring

litigation.  (Master Stat. of Uncontroverted Material Facts Ex. U at 2, ECF No. 49-15.)  It

was Commonwealth's understanding

> that in connection with the closing of the sale by Bower & Bailey of the
> improved lots in St. Charles County, Integrity Land Title disbursed the sale
> proceeds to Bower & Bailey without obtaining lien waivers or other proof that
> the various contractors/subcontractors had been paid.  Thereafter, Integrity
> Land Title issued owner and loan policies on the respective properties with
> mechanic's lien coverage.

(Id.)  Bartlett was advised that, pursuant to Integrity Land's agency agreement with

Commonwealth, it might be liable for Commonwealth's losses, expenses, and fees.  (Id.)

Commonwealth's demand letter was forwarded to Lexington in March 2009.  (Master

Stat. of Uncontroverted Material Facts ¶ 55.)  Two days later, Lexington acknowledged

receipt of the claim.  (Id. ¶ 56.)  The following month, Dennis Galvin, a claims examiner for

Lexington, wrote Bartlett that, "given the limited information known concerning th[e] claim,"

Lexington was accepting it under a "full reservation of rights" and had retained counsel to

represent Integrity Land.  (Master Stat. of Uncontroverted Material Facts Ex. W, ECF No.

49-17.)

In July 2009, Kevin Gill, the then-current claims examiner for Lexington, wrote

Bartlett that Lexington had decided that Integrity Land's claim was not covered under its

policy.  (Master Stat. of Uncontroverted Material Facts ¶ 59; Fidelity Stat. of Uncontroverted

Material Facts ¶ 216.)  Specifically, coverage was denied because the Contemporary

Flooring case filed in March 2008 named Integrity Land as a defendant and was, therefore,

made prior to the inception date of Lexington's policy.  (Master Stat. of Uncontroverted

Material Facts Ex. Y at 2, ECF No. 49-19.)  Retained counsel was so advised.  (Id.)  Bartlett was advised to submit any additional information he thought was relevant to the denial.  (Id. at 3.)

One year later, in July 2010, Commonwealth sued Bower & Bailey and its principal, Integrity Land,[6] and Lexington.  (Compl. Ex. F.)  Allegations against Integrity Land included that it had breached its agency agreement with Commonwealth by not properly closing various homeowners' purchase transactions with Bower & Bailey[7] between September 2006 and August 2008 and that, consequently, Commonwealth had had to settle claims brought by those homeowners when mechanic's liens were placed against their property.  (Id. at 6-12.)  Relief against Integrity Land was sought for breach of contract, negligence, negligent misrepresentation, negligent concealment, and indemnification.  (Id. at 23-35.)  Third-party beneficiary claims were brought against Lexington for an amount in excess of $2,500,000.00.  (Id. at 35-37.)

Bartlett forwarded the Commonwealth suit to Lexington in August 2010 and requested coverage.  (Master Stat. of Uncontroverted Material Facts ¶ 61.)  The following month, he was advised by a claims examiner that Lexington had not changed its position that Integrity Land had been aware of the claims at issue prior to the inception of the Lexington policy and

_____

[6]Integrity Disbursing was not named as a defendant.

[7]For instance, Integrity Land allegedly failing to investigate whether all contractors who had furnished services, equipment, labor, or materials had been paid by Bower & Bailey, to verify that all lien waivers from such contractors had been received, and not to close any sale or issue any title insurance policy for properties for which there were unpaid contractor invoices.  (Id. at 10.)

that coverage was denied.  (Master Stat. of Uncontroverted Material Facts Ex. BB, ECF No. 49-22.)

At all times relevant, Commonwealth and Integrity Land had an agency agreement. (Master Stat. of Uncontroverted Material Facts Ex. G, ECF No. 49-1.)  The agreement did not require that Integrity Land make Commonwealth an additional insured on its Lexington policy.  (Master Stat. of Uncontroverted Material Facts Ex. I, Mark Dickhute Dep. at 29, ECF No. 49-3.)  Also lacking from the agreement was a requirement that Commonwealth was to be named as a third-party beneficiary of any errors and omissions policy purchased by Integrity Land.  (Id. at 34.)  The agreement did require that Integrity Land was to "retain in force at its expense title insurance agent's errors and omissions coverage in the amount of at least $100,000.00."  (Master Stat. of Uncontroverted Material Facts Ex. G at 1.)  The insurance carrier and form of such policy was to be acceptable to Commonwealth.  (Id.) Also, Integrity Land was to provide Commonwealth a copy of the policy and, among other things, a statement from the carrier agreeing to give Commonwealth notice of any change in coverage or of cancellation.  (Id.)  Dickhute testified in his deposition that the agent in an agency agreement regularly did not provide the name of the errors and omissions insurer. (Dickhute Dep. at 42-46.)

Dickhute had no direct communications with Lexington about any claims, nor did he know if anyone else with Fidelity, Commonwealth, or Lawyers Title had.  (Id. at 41.)

The Policy.   An application was submitted to Lexington[8] by Bartlett on behalf of Integrity Land, Integrity Disbursing, Integrity Title Affiliates LLC, and Hancock Title LLC (collectively referred to as "the Applicant") in February 2008 for an errors and omissions policy.[9]   (Master Stat. of Uncontroverted Material Facts Ex. L, ECF No. 49-6.)   The Applicant was described as a licensed abstractor/searcher, licensed title insurance agent, and escrow agent.   (Id. at 1.)   Sixty percent of its revenue was derived from its role as a title agent; thirty-five percent from its role as a closing/escrow agent; and five percent from its role as a title abstractor/searcher.   (Id. at 1, 5.)   Question 15 asked whether "any person or entity proposed for insurance ha[s] knowledge of any act, error or omission which might give rise to a claim(s) under the proposed policy?"   (Id. at 7.)   The "No" was circled.   (Id.) Question 16 asked if "there [has] been or is there now pending any litigation or claim against or civil, criminal, administrative or regulatory action or proceeding of the Applicant or any person or entity proposed for insurance?"   (Id.)   "No" was initially circled; that circle was crossed out and "Yes" was circled.   (Id.)   If the answer was "yes," the Applicant was to "attach a detailed description of each such litigation, action, proceeding and investigation and all relevant details."   (Id.)   No such attachment is included in the exhibit, nor has its absence been explained.

_____

[8]Lexington is a surplus lines insurer.   As such, it is required to be licensed to do business in Missouri,  See Mo.Rev.Stat. § 384.015.

[9]An errors and omissions policy "generally 'protect[s] against liability based on the failure of the insured, in his or her professional status, to comply with what can be considered in simplistic terms to be the standard of care for that profession.'"  **In re SRC Holding Corp.**, 545 F.3d 661, (8th Cir. 2008) (quoting Couch on Insurance § 1:35 (3d ed. 2008)).

In April, Bartlett signed another application for a Lexington policy.[10]  (Master Stat. of Uncontroverted Material Facts Ex. K, ECF No. 49-5.)  With the exception of the February 2008 date being crossed out and an April 2008 date being written underneath, this application appears to be the same as the February one, including Questions 15 and 16, the "No" response to Question 15, the changed response to Question 16, the request for an attachment, and the apparent lack of one.  (Id.; Master Stat. of Uncontroverted Material Facts ¶ 14-15)  (See also Bartlett Dep. at 126, looking at the application and responding he did not see an attachment in response to Question 16.)

Bartlett was asked in his deposition about the reason for his affirmative answer to Question 16.  He testified that he did not recall what pending litigation he had referred to.  (Bartlett Dep. at 66.)   It could have been the Contemporary Flooring litigation; when testifying he could think of no other existing or potential claims.  (Id. at 59, 66.)  Asked if an addenda or separate description produced during discovery and listing litigation involving someone named Lock sounded familiar, Bartlett replied, "yes."  (Id. at 127.)   No other litigation was listed on that document.  (Id. at 131.)  Moreover, Bartlett did not believe the Contemporary Flooring litigation exposed Integrity Land or Integrity Disbursing to potential liability because each was named only in its capacity as trustee.  (Id. at 131-32.)

_____

[10]This application was apparently submitted in response to Lexington's requirement that the application needed to be dated within thirty days of the effective date.  (See Fidelity Stat. of Uncontroverted Material Facts ¶ 198 and Ex. MM, ECF Nos. 52, 52-7.)

Integrity Land Title Company of Kansas City, LLC, and Lawyers Title had been named in a suit filed by John and Diane Lock in January 2007 and had been served in March 2007.  See Lock v. Lawyers Title Ins. Corp., No. 07CY-CV01443 (Mo. Cir. Ct. 2007) (docket sheet available at https://www.courts.mo.gov/casenet/cases/searchDockets.do (last visited Jan. 24, 2012).  The suit was dismissed in August 2007.  (Id.)

Lexington issued Integrity Land, Integrity Disbursing, Integrity Title Affiliates LLC, and Hancock Title Agency, LLC, a miscellaneous professional liability insurance policy ("the Policy").  (Compl. Ex. A.)  It is a claims made and reported Policy.  (Id.)  The Policy period was from April 2, 2008, to April 2, 2009,[11] with a retroactive date of May 23, 2006.  (Id.)  Under the Policy, Lexington agreed to

> pay on behalf of the Insured Damages for which the Insured becomes legally obligated to pay because of any Claim first made against the Insured during the Policy Period and reported in writing to the Company pursuant to the terms of this policy, within the Policy Period . . . .  Such Damages must arise out of the actual or alleged Wrongful Act first committed on or after the Retroactive Date . . . in the course of the Insured's rendering or failing to render Professional Services for others.

(Id. at 5.)

The retroactive date is defined in the Policy as "the date . . . on or after which any act, error or omission must have occurred in order for Claims arising therefrom to be covered under this policy.  Claims arising from any act, error or omission occurring prior to this date are not covered by this policy."  (Id. at 6.)  A Claim is "a notice received by an insured from

---

[11]The policy period was later amended to April 15, 2008, to July 15, 2009.  (Id. at 26.)

a person or entity advising that it is the intention of that person or entity to hold the Insured

liable for Damages for a Wrongful Act covered under this policy."  (Id. at 5.)  Moreover,

> Claim includes but is not limited to a demand received by an Insured for
> money or services, the service of suit or institution of arbitration proceedings,
> or a request received by an Insured for a tolling agreement with respect to
> statutes of limitation or other extension to allow filing or maintenance of
> Claims against the Insured.

(Id.)  Related Claims were "collectively all Claims involving the same Wrongful Act or

Wrongful Acts which are logically or causally connected by reason of any common fact,

circumstance, situation, transaction, event or decision."  (Id. at 6.)  A Wrongful Act was "any

actual or alleged act, error, omission . . . committed solely in the performance of, or failure

to perform, Professional Services.  (Id.)  The Policy specifically did not include, inter alia,

any Claim "based upon or arising out of any alleged act, error, omission or circumstance

likely to give rise to a Claim that an Insured had knowledge of prior to the effective date of

this policy.  This exclusion includes, but is not limited to any prior Claim or possible Claim

referenced in the Insured's application."  (Id. at 7.)  The Policy excluded, inter alia, claims

seeking non-pecuniary relief.  (Id. at 8.)

> Also, a condition of the Policy was that
>
> [t]he Insured represents that the particulars and statements contained in the
> application and all materials submitted in connection therewith are true,
> accurate and complete, and agrees that this policy is issued in reliance on the
> truth of that representation, and that such particulars and statements, which are
> incorporated into and constitute a part of the this policy, are the basis of this
> policy and are material to the Company's acceptance of this risk.

(Id. at 14.)

As a condition of coverage, Integrity Land and Integrity Disbursing had to "give written notice to the Company of any Claim as soon as practicable after such Claim is first made during the Policy Period or 30 day Basic Reporting Period . . . and as otherwise required by this policy . . . ." (Id. at 11.)  A Related Claim was deemed to have been first made either at (1) "at the time the earliest of the Related Claims was first made" or (2) "at the earliest time at which notice was given under any policy of insurance of any act, error, omission, fact, circumstance, situation, transaction, event or decision underlying any of the Related Claims," whichever occurred first.  (Id.)

An amendatory endorsement excluded from coverage "any claim arising out of any release of funds without receipt of . . . appropriate waivers or releases of liens from any contractor, subcontractor, or materials or service provider . . . " and "any claim arising from the inability or failure of any title insurance company to pay any Claim." (Id. at 18.)  Also excluded from coverage was "any claim or litigation against any insured occurring prior to, or pending as of the inception date of this policy including (but not limited to) claims, demands, causes of action, legal or quasi-legal proceedings, decrees, or judgments" and "any subsequent litigation or claims arising from, or based on substantially the same matters as alleged in the pleadings of such prior or pending litigation . . . ."  (Id. at 21.)

The Policy further provided that

[b]y acceptance of this policy the Insured agrees that the statements in the Declarations and the Application and any supplements attached hereto are the Insured's representations and that this policy is issued in reliance on them and embodies all agreements between the Insured and the Company of any of its representatives relating to this insurance.

- 18 -

(Id. at 1.)

Nothing in the Policy identifies Fidelity, Commonwealth, or Lawyers Title as a third-party beneficiary of the Policy. (Id. at 1-27; Dickhute Dep. at 56.) Dickhute did not see the Policy until the day before his deposition in August 2011. (Id. at 47.)

The Motions. In its motion, Lexington argues that it has no duty to defend or cover Integrity Land or Integrity Disbursing on (a) the Talley claim because it was before the Policy's effective date; (b) the Gassen claim because it was a related claim to the Talley claim and there was no timely notice; (c) the Contemporary Flooring claims because they were pending prior to the inception of the Policy; and (d) the Commonwealth claim because it arose from or is based on the substantially the same matters as the Contemporary Flooring claims.

Lexington further argues that it is entitled to judgment as a matter of law on Fidelity's claim that it is a third-party beneficiary.

Fidelity argues in its motion that (1) the Gassen claim is covered because the wrongful act took place after the Policy's retroactive date, and (2) the Commonwealth claim is covered because it is within the Policy's definition of a claim under the policy, it was made within during the Policy period, and it was not foreclosed by the Contemporary Flooring litigation, which was not a claim within the meaning of the Policy, did not include claims from various contractors or material suppliers that were part of the Commonwealth suit, and did include claims arising from closings occurring after the Contemporary Flooring litigation.

Additionally, Fidelity contends that it is not trying to recover damages on third-party beneficiary claims but is challenging Lexington's wrongful denial of Integrity Land's and Integrity Title's claims.

 As noted above, Integrity Land and Integrity Disbursing also move for summary judgment.  In their five-paragraph motion, unsupported by separate memorandum, they adopt Fidelity's motion and memorandum.  Their motion is filed after the deadline and without leave of Court.

## Discussion

"Summary judgment is . . . proper 'if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.'"  **Torgerson v. City of Rochester**, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc) (quoting Fed.R.Civ.P. 56(c)(2)).  "The movant 'bears the initial responsibility of informing the . . . [C]ourt of the basis for its motion,' and must identify 'those portions of [the record] . . . which it believes demonstrate the absence of a genuine issue of material fact.'"  **Id.** (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)) (last two alterations in original).   "If the movant does so, the nonmovant must respond by submitting evidentiary materials that set out 'specific facts showing a genuine issue for trial.'"  **Id.** (quoting Celotex Corp., 477 U.S. at 324).   The nonmovant must "explain the legal significance of her factual allegations beyond mere conclusory statements importing the appropriate terms of art."  **Quinn v. St. Louis Cnty.,**

653 F.3d 745, 752 (8th Cir. 2011).   "'Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.'"  **Torgerson**, 643 F.3d at 1042 (quoting <u>Reeves v. Sanderson Plumbing Prods. Inc.</u>, 530 U.S. 133, 150 (2000)).

Additionally, summary judgment is "particularly appropriate" when only questions of law are at issue. **Cremona v. R.S. Bacon Veneer Co.**, 433 F.3d 617, 620 (8th Cir. 2006). "Under Missouri law, it is well-settled that the interpretation of an insurance policy is a question of law." **Council Tower Ass'n v. Axis Specialty Ins. Co.**, 630 F.3d 725, 728 (8th Cir. 2011).

In this insurance dispute, Missouri law is applicable, see **J.E. Jones Constr. Co. v. Chubb & Sons, Inc.**, 486 F.3d 337, 340 (8th Cir. 2007); **Capitol Indemn. Corp. v. 1405 Assocs., Inc.**, 340 F.3d 547, 549 (8th Cir. 2003), and holds that an insurance policy is a contract governed by the rules of contract construction, see **Leonards v. Southern Farm Bureau Cas. Ins. Co.**, 279 F.3d 611, 613 (8th Cir. 2002); **Blair v. Perry Cnty. Mut. Ins. Co.**, 118 S.W.3d 605, 606 (Mo. 2003) (en banc).  "Under Missouri law, the claimant has the burden to show that the policy covers the loss," **J.E. Jones Constr.**, 486 F.3d at 340; however, "'[t]he insurer has the burden of proving that an insurance policy exclusion applies,'" **Am. Econ. Ins. Co. v. Jackson**, 476 F.3d 620, 623 (8th Cir. 2007) (quoting <u>Am. Family Mut. Ins. Co. v. Co Fat Lee</u>, 439 F.3d 436, 439 (8th Cir. 2006)).  <u>Accord</u> **Am. States Ins. Co. v. Mathis**, 974 S.W.2d 647, 649 (Mo. Ct. App. 1998).  "An exclusion relied upon

to deny coverage must be clear and free from doubt." **Jackson**, 476 F.3d at 623 (internal

quotations omitted); accord **Freeman v. State Farm Mut. Auto. Ins. Co.**, 436 F.3d 1033,

1035 (8th Cir. 2006).  "If there is any ambiguity in the policy, it inures to the benefit of the

insured, not the insurer." **Machea Transp. Co. v. Philadelphia Indem. Co.**, 463 F.3d 827,

832 (8th Cir. 2006).  "Mere disagreement by the parties[, however,] regarding a contract

term's interpretation does not render the term ambiguous." **Lindsay v. Safeco Ins. Co.**, 447

F.3d 615, 617 (8th Cir. 2006); accord **Cincinnati Ins. Co. v. Venetian Terrazzo, Inc.**, 198

F. Supp.2d 1074, 1078 (E.D. Mo. 2001).

Additionally, "[t]he provisions of an insurance policy are read in the context of the

policy as a whole." **Am. Econ. Ins. Co.**, 476 F.3d at 624 (internal quotations omitted).

Thus, "construction or interpretation of an insurance policy which entirely neutralizes one

provision should not be adopted if the contract is susceptible [to] another construction which

gives effect to all its provisions and is consistent with the general intent." **Murray v. Am.**

**Family Mut. Ins. Co.**, 429 F.3d 757, 766 (8th Cir. 2005) (alteration in original) (internal

quotations omitted).  See also **Seeck v. Geico Gen. Ins. Co.**, 212 S.W.3d 129, 134 (Mo.

2007) (en banc) ("Where . . . an other insurance clause appears to provide coverage but other

clauses indicate that such coverage is not provided, then the policy is ambiguous, and the

ambiguity will be resolved in favor of coverage for the insured.").

Under Missouri law, there are two main types of professional liability policies:

claims made policies and occurrence policies.  **Landry v. Intermed Ins. Co.**, 292 S.W.3d

352, 355 (Mo Ct. App. 2009); **Northern v. Physicians Def. Ass'n**, 88 S.W.3d 130, 134 (Mo. Ct. App. 2000).  As noted above, the policy at issue is a "claims made" policy.[12]  "[A] claims made policy provides coverage when the act or omission is discovered and brought to the attention of the insurer, regardless of when the act or omission occurred."[13]  **Wittner, Poger, Rosenblum & Spewak, P.C. v. Bar Plan Mut. Ins. Co.**, 969 S.W.2d 749, 754 (Mo. 1998) (en banc) (internal quotations omitted); accord **Lexington Ins.**, 88 F.3d at 634.  "Claims made policies place special reliance on notice," **Landry**, 292 S.W.3d at 356; thus, with a claims made policy, "if there is no timely notice, there is no coverage," **Lexington Ins.**, 88 F.3d at 634 (noting that Missouri cases emphasize the necessity of this timely notice).  Also, "[b]y limiting coverage to claims made and reported during the policy term, a claims made policy 'allows the insurer to more accurately fix its reserves for future liabilities and compute premiums with greater certainty.'"  **H & R Block, Inc.**, 546 F.3d at 942 (quoting FDIC v. St. Paul Fire & Marine Ins. Co., 993 F.2d 155, 158 (8th Cir. 1993)).

The Gassen Claim.  As in **Wittner**, 969 S.W.2d at 752, three dates are relevant to whether there is coverage under the Policy for the Gassen claim:  "the date of the act or omission; the date claim is made against the insured; and the date the insured reports the

_____

[12]The policy is titled "A Claims Made and Reported Policy."  (Master Stat. of Uncontroverted Facts Ex. A.)  As the Eighth Circuit noted in **Lexington Ins. Co. v. St. Louis Univ.**, 88 F.3d 632, 634 (8th Cir. 1996), a claims made and reported policy is construed similarly to claims made policy.

[13]"By contrast, 'occurrence' policies generally provide coverage for an event that occurs during the policy period, regardless of when a claim is asserted."  **H & R Block, Inc. v. Am. Int'l Specialty Lines Ins. Co.**, 546 F.3d 937, 939 (8th Cir. 2008) (internal quotations omitted).

claim to the carrier."  The title commitment giving rise to the suit was issued in October 2006, within the Policy period; the Gassen *suit* was filed August 2009, after the Policy period; Lexington was advised of the suit in April 2010, after the Policy period.  Lexington argues that the third date excludes coverage because the Gassen claim was reported after the policy period ended.  On the other hand, Fidelity argues that Lexington had timely notice of the Gassen claim because under the Policy definition of a related claim as "involving the same Wrongful Act or Wrongful Acts which are logically or causally connected by reason of any common fact, circumstance, situation, transaction, event or decision," see Complaint Exhibit A at 6, the Gassen claim is related to the Talley claim, which was reported during the policy period.

Under Missouri law, "the claimant bears the burden of proving coverage . . . ," **Penn-Star Ins. Co. v. Griffey**, 306 S.W.3d 591, 596 (Mo. Ct. App. 2010); accord **J.E. Jones Constr. Co.**, 486 F.3d at 340; **Kearns v. Interlex Ins. Co.**, 231 S.W.3d 325, 330 (Mo. Ct. App. 2007), "[e]ven though it is an insurer that brings a declaratory judgment action[,]" **Shelter Mut. Ins. Co. v. Ballew**, 203 S.W.3d 789, 792 (Mo. Ct. App. 2006); accord **State Farm Mut. Auto. Ins. Co. v. Stockley**, 168 S.W.3d 598, 600 (Mo. Ct. App. 2005).

Fidelity argues that the Gassen and Talley claims are related because they concerned the same title search and the same condemnation judgment; consequently, the date of notice of the Talley claim applies to the Gassen claim.  This argument fails for two reasons.  First, the same title search is not at issue.  There was a title search performed when the Talleys

purchased the property. There was another, later search when the Gassens purchased the property from the Talleys. If Integrity Land had not performed a title search for the Gassen purchase but had merely relied on the Talley search, Fidelity's characterization of the Gassen title search as being the same as the Talley search would be accurate. But, Integrity Land performed a new title search for a new real estate transaction for different clients. Similarly, if an attorney misses a filing deadline for a products liability suit because of a misreading of a statute of limitations and three years later untimely files another suit involving different plaintiffs and different injuries but arising from the defective product, clearly the second suit would not relate back to the first regardless of whether the same limitations mistake had given rise to the insurance claim.

Under Fidelity's interpretation of a related claim, a claim by subsequent purchasers from the Gassens of the lot at issue would be a related claim if Integrity Land again failed to discover the condemnation judgment when doing a title search for the new purchasers. The continuing threat of claims this interpretation would pose would defeat the purpose of a claims made and reported policy to "allow[ ] the insurer to more accurately fix its reserves for future liabilities and compute premiums with greater certainty." **H & R Block, Inc.**, 546 F.3d at 942 (internal quotations omitted).

It is undisputed that Integrity Land did not give Lexington notice of the *Gassen* claim until after the policy period ended. In a claims made policy, "if there is no timely notice, there is no coverage." **Lexington Ins.**, 88 F.3d at 633; accord **FDIC.**, 993 F.2d at 158. There is also no need for the insurer to prove prejudice if there is no timely notice.

- 25 -

**Lexington Ins.**, 88 F.3d at 634.  In the instant case, there was no timely notice of the Gassen claim; hence, it is not covered under the Policy.

The parties agree that there is no coverage for the Lawyers Title claim if there is no coverage for the Gassen claim.

The Contemporary Flooring Claim.  When applying for insurance with Lexington, Integrity Land and Integrity Disbursing answered "yes" to the question whether there had been or was pending any litigation or claim against them.  No further explanation, although requested, was given.  The answer was "no" to the preceding question:  whether the applicant "ha[d] knowledge of any act, error or omission which might give rise to a claim(s) under the proposed policy?"  (Master Stat. of Mat. Facts Ex. K at 7, Ex. L at 7.)  The Policy excludes from coverage any Claim "based upon or arising out of any alleged act, error, omission or circumstance likely to give rise to a Claim that an Insured had knowledge of prior to the effective date of this policy.  This exclusion includes, but is not limited to any prior Claim or possible Claim referenced in the Insured's application."  (Compl. Ex. A at 7.)  "'When an insurance company relies on a policy exclusion to assert noncoverage, it has the burden of proving that such an exclusion is applicable, and [the Court] will construe the exclusion clause strictly against the insurer.'"  **Jensen v. Allstate Ins. Co.**, 349 S.W.3d 369, 374-75 (Mo. Ct. App. 2011) (quoting Oakley Fertilizer v. Cont'l Ins. Co., 276 S.W.3d 342, 351 (Mo. Ct. App. 2009)).  See also **Burns v. Smith**, 303 S.W.3d 505, 510 (Mo. 2010) (en banc)

- 26 -

("Missouri also *strictly* construes exclusionary clauses against the drafter, who also bears the burden of showing the exclusion applies.").

The Policy defines as a claim as "a notice received by an insured from a person or entity advising that it is the intention of that person or entity to hold the Insured liable for Damages for a Wrongful Act covered under this policy." (Compl. Ex. A. at 5.) A claim may include "a demand received by the [i]nsured for money or services," but excluded from coverage is "any claim or litigation against any insured occurring prior to, or pending as of the inception date of this policy including (but not limited to) claims, demands, causes of action, legal or quasi-legal proceedings, decrees, or judgments" and "any subsequent litigation or claims arising from, or based on substantially the same matters as alleged in the pleadings of such prior or pending litigation . . . ." (Id. at 5, 21.) Also excluded from coverage is any claim "based upon or arising out of any alleged act, error, omission or circumstance likely to give rise to a Claim that an Insured had knowledge of prior to the effective date of this policy. This exclusion includes, but is not limited to any prior Claim or possible Claim referenced in the Insured's application." (Id. at 7.) And, as noted above, "a claims made policy provides coverage when the act or omission is discovered and brought to the attention of the insurer, regardless of when the act or omission occurred." **Ins. Placements, Inc. v. Utica Mut. Ins. Co.**, 917 S.W.2d 592, 597 (Mo. Ct. App. 1996).

Lexington argues that the claims against Integrity Land and Integrity Disbursing arising from the unpaid mechanic's liens on the Bower & Bailey lots came to their attention in March 2008 when the Contemporary Flooring suit was served and mechanic lien's claims

were made.  It is undisputed that Integrity Land and Integrity Disbursing did not give Lexington notice of the Contemporary Flooring suit.  Fidelity counters that the controlling date is when *Commonwealth* presented Integrity Land and Integrity Disbursing in February 2009 with a demand for indemnification.  If Lexington is correct, there is no coverage; conversely, if Fidelity is, there is.  See **Landry**, 292 S.W.3d at 356 (noting that "the event which invokes coverage in a claims made policy is transmittal of notice of the claim to the insurer").

"[C]overage under most claims made policies is triggered when a *negligent act or omission* is discovered and reported to the insured during the policy period."  **Id.**  "This emphasizes the reciprocal responsibility of the insured to report all acts and occurrences that could become future claims."  **Id.**

In **Continental Cas. Co. v. Maxwell**, 799 S.W.2d 882 (Mo. Ct. App. 1990), the court rejected an insurer's argument that he had not made a material misrepresentation on his application for legal malpractice insurance when not disclosing a former client's counterclaim in a suit the insured had brought for owed attorney's fees.  The counterclaim was for breach of contract for failure to perform agreed-upon legal services, to investigate and review certain documents, and to disclose certain facts to the corporate client and its principals.  **Id.** at 884.  After the insurance policy was issued, the former client sued the insured for negligence and breach of fiduciary duty.  **Id.**  The insured explained his failure to disclose the counterclaim as being based on his belief that it "was not and would not become a professional liability

- 28 -

claim . . . ." **Id.** at 887.  The question at issue asked if the applicant knew of "any circumstances, acts, errors, or omission that could result in a professional liability claim . . . ." **Id.**  The court held "[t]hat the dispute, at the time [the insured] completed the application, was couched in terms of a fee dispute is not controlling because a circumstance existed which could have resulted in a claim." **Id.**  Consequently, the insured had notice of the malpractice claim and had failed to properly report it. **Id.**

Similarly, although the issue in the pending case is of notice and not misrepresentation, Integrity Land and Integrity Disbursing had notice of "any act, error or omission which might give rise to a claim(s) under the proposed policy" when, in the same month, (a) they were served with a suit alleging that Bower & Bailey had not paid mechanic's liens on properties for which Integrity Land had issued title commitments without mechanic's liens exclusions and for which Integrity Disbursing had disbursed construction funds without obtaining lien waivers and (b) they received claims relating to unpaid mechanic's liens. "Might" is "[a] possibility as distinct from a certainty."  Oxford English Dictionary, http://www.oed.com/view/Entry/236226? (last visited Jan. 30, 2012).  See **Foremost Signature Ins. Co. v. Montgomery**, 266 S.W.3d 688, 871 (Mo. Ct. App. 2008) ("Courts may consider dictionary definitions to determine the common meaning of contract terms."). In March 2008, Integrity Land and Integrity Title had notice that their role in the Bower & Bailey real estate transactions might give rise to a claim.  See e.g. **Landry**, 292 S.W.3d at 358 (finding that e-mail from insured to insurer giving time, place, and circumstances of

misdiagnosis; name of injured; and extent of claim anticipated gave insurer essential facts that liability might arise from misdiagnosis and was sufficient notice under claims made medical malpractice policy); **Wittner, Poger, Rosenblum & Spewak, P.C.**, 969 S.W.2d at 753 (finding that there was no coverage under claims made policy when insured knew before policy period that default divorce degree had been entered against client and had been informed by client that she might pursue claim). On the other hand, in **Fremont Indem. Co. v. Lawton-Byrne-Bruner Ins. Agency Co.**, 701 S.W.2d 737, 741 (Mo. Ct. App. 1985), the court found that insured's letter of inquiry to state agency expressing concern that it had been overcharged by broker, copy of which letter had been forwarded to broker, was not notice to broker of claim under broker's claims made errors and omissions policy. The court noted that the letter was written five months before the insured applied for the policy and had been followed by silence until suit was filed during policy period. **Id.** In the instant case, however, the Contemporary Flooring suit and the concomitant claims were presented to Integrity Land and Integrity Title and were clearly the beginning of a dispute and not a finite concern expressed to another entity and only incidentally communicated to the insured.

Bartlett testified that he did not consider the Contemporary Flooring suit to be a claim because Integrity Land and Integrity Title were named only as trustees and no damages were sought from either. The complained-of actions in that suit, however, clearly presented both Integrity Land and Integrity Title with notice that a claim might be filed against one or both. Bartlett's lack of concern is especially troubling given that the same month the suit was filed

Integrity Land forwarded to Commonwealth fifteen claims arising from Bower & Bailey's failure to pay liens. The forwarding of the claims to Commonwealth is consistent with Bartlett's testimony that homeowners get protection from liens filed after closings by obtaining title insurance. (Bartlett Dep. at 35.) Bartlett did not recall this communication until shown the related e-mails. (See Bartlett Dep. at 46-47.) Also telling is that the application submitted in April 2008 – one month after the Contemporary Flooring suit and forwarded claims – is the same as that submitted in February – one month before – with the only change being in the date it was signed.[14]

Cited in further support of the argument that the Contemporary Flooring suit was not notice is the lack of a request in that suit for damages. In **Berry v. St. Paul Fire & Marine Ins. Co.**, 70 F.3d 981, 982 (8th Cir. 1995), a letter to the insured from an attorney representing a man injured using the insured's product and asking that the letter be forwarded to insurer for discussion prior to the lawyer filing suit was held to be a "claim" within meaning of claims made policy. Although the letter did not state a request for damages, it did refer to the man sustaining "'severe and permanent disability'" and an *inference* that the man should be compensated in money was "unmistakable." **Id.** The court rejected the insurer's claim that the letter "was merely a communication of a present legal right." **Id.**

_____

[14]The parties vigorously argue whether the "yes" to Question 16 refers to the Lock litigation or to the Contemporary Flooring litigation. Because the application dated April 2008 was clearly merely a redated copy of the February 2008 application, it is unlikely that the "yes" referred to the Contemporary Flooring. Whether it referred to the Lock litigation, dismissed at least six months earlier, is unclear. The dispute, however, is irrelevant.

"[A]nyone receiving this letter would know that [the man] was claiming he was owed money." **Id.**  Companies playing the roles that Integrity Land and Integrity Disbursing played in the Bower & Bailey transactions would know that there was a failure to pay mechanic's liens that might give rise to a claim against them.[15]

Lexington cites another exclusion provision in the Policy in support of their argument that there is no coverage for the Commonwealth claims.  An amendatory endorsement excluded from coverage "any claim arising out of any release of funds without receipt of . . . appropriate waivers or releases of liens from any contractor, subcontractor, or materials or service provider . . . " and "any claim arising from the inability or failure of any title insurance company to pay any Claim."  (Id. at 18.)  Fidelity counters that only exclusions previously asserted by Lexington may be considered on summary judgment.

Under Missouri law, "[a]n 'insurer, having denied liability on a specified ground, may not thereafter deny liability on a different ground.'"  **Sauvain v. Acceptance Indem. Ins. Co.**, 339 S.W.3d 555, 560 (Mo. Ct. App. 2011) (quoting Brown v. State Farm Mut. Auto. Ins. Co., 776 S.W.2d 384, 386 (Mo. 1989) (en banc)).  "To estop an insurer from asserting a policy defense, Missouri law requires that the insured show (1) the insurer asserted a policy defense in denying coverage and later asserted another inconsistent ground, (2) the insurer's

---

[15]Fidelity also argues that the Commonwealth claim is covered because other suppliers with additional liens were not part of the Contemporary Flooring litigation – indeed, some title commitments had not issued at the time of the suit was filed – and, therefore, could not have arisen from the same matters as alleged in that suit.  Lexington counters, and the Court agrees, that the absence of later-filed claims in the Contemporary Flooring litigation is irrelevant since those claims arise from or are based on the same wrongful acts.

actions induced the insured to rely on the original defense and thereby caused injury, and (3) the insured suffered prejudice as a result of such reliance."[16]  **Versaw v. Versaw**, 202 S.W.3d 638, 650 (Mo. Ct. App. 2006).  "Estoppel will not be lightly embraced in an insurance coverage case; it only has application when all elements thereof clearly appear." **Id.**

The lien waiver defense is not an inconsistent defense to the lack of notice defense; rather, it is an additional defense.  Moreover, Fidelity does not argue that any prejudice resulted from the timing of its assertion.

Fidelity does argue that, regardless of its timing, the lien waiver exclusions are irrelevant because the Commonwealth claim arose from the absence of mechanic lien exceptions in the title insurance policies, not from the liens themselves.  The record does not support this argument.  Dickhute testified that the Commonwealth demand letter *included* the absence of such exceptions *and* the lack of waivers themselves.  (Dickhute Dep. at 101-03.)  And, as noted above, the Commonwealth petition included allegations against Integrity Land that focused on the failure to obtain lien waivers.  (See e.g. Compl. Ex. F at 26-27.)

Thus, insofar as the claims against Lexington arise from Integrity Land or Integrity Disbursing's failure to obtain lien waivers, they are excluded from coverage.

---

[16]In limited circumstances, the doctrine of waiver precludes an insurer's defense.  **Cedar Hill Hardware and Constr. Supply, Inc. v. Hannover**, 563 F.3d 329, 342 (8th Cir. 2009).  The circumstances are "either (1) an express waiver by the insurer or (2) conduct which clearly and unequivocally shows a purpose by the insurer to relinquish a contractual right."  **Id.** (internal quotations omitted).  In the instant case, there is no express waiver and Fidelity does not cite any qualifying conduct.

The Court has reviewed Fidelity's remaining arguments and finds them to be without merit.

<u>Fidelity's Status.</u>  Fidelity alleged in its complaint in intervention that it has a legally protectable interest in Lexington's suit "[a]s a third-party beneficiary to the [errors and omissions] policy."  (Int. Compl. ¶ 44.)  In its memorandum in support of its motion to summary judgment, Fidelity argues that it is a third-party beneficiary to the errors and omissions policy.  (Mem. at 3, ECF No. 53.)  In its reply memorandum in answer to Lexington's contention it is not a third-party beneficiary, Fidelity argues that it "intervened in order to protect its interest as the party that suffered the losses resulting from Integrity's errors and omissions . . . ."[17]  (Reply Mem. at 1, ECF No. 66.)  Lexington was incorrect in asserting "Fidelity seeks summary judgment to recover damages on third-party beneficiary contract claims."  (<u>Id.</u>)

"A third party beneficiary is [o]ne for whose benefit a promise is made in a contract but who is not a party to the contract."  **RLI Ins. Co. v. Southern Union Co.**, 341 S.W.3d 821, 830 (Mo. Ct. App. 2011) (alteration in original) (internal quotations omitted).

"'The general rule is that an injured party cannot proceed in a direct action against an insurance company providing liability insurance for an insured who allegedly caused the harm sustained by the claimant.'"  **Grisamore v. State Farm Mut. Auto. Ins. Co.**, 306

---

[17]Fidelity also asserts that it has "taken direct assignments of Talleys' and Gassens' claims." (Mem. at 3.)  The only supporting evidence before the Court, however, is Bartlett's testimony that he and Fidelity had not reached an agreement for an assignment.  (<u>See</u> Barltett Dep. at 86-87.)

S.W.3d 570, 574 (Mo. Ct. App. 2010) (quoting <u>Desmond v. Am. Ins. Co.</u>, 786 S.W.2d 144, 145 (Mo. Ct. App. 1989)).[18]  "Third-party beneficiaries, however, may sue for declaratory judgment if they could enforce the contract."  **Peters v. Employers Mut. Cas. Co.**, 853 S.W.2d 300, 301 (Mo. 1993) (en banc).  "A third-party beneficiary can sue to enforce the contract *if* the contract terms 'clearly express' an intent to benefit either that party or an identifiable class of which the party is a member."  **Id.**; <u>accord</u> **RLI Ins. Co.**, 341 S.W.3d at 830.  <u>Accord</u> **McKenzie v. Columbian Nat'l Title Ins. Co.**, 931 S.W.2d 843, 845 (Mo. Ct. App. 1996)  ("Only those third parties for whose primary benefit the contracting parties intended to make the contract [that] may sue on the contract.") (internal quotations omitted).  "The intention of the parties is to be gleaned from the four corners of the contract, and if uncertain or ambiguous, from the circumstances surrounding its execution."  **JTL Consulting, L.L.C. v. Shanahan**, 190 S.W.3d 389, 399 (Mo. Ct. App. 2006) (internal quotations omitted).

There is nothing in the Policy to suggest that the parties intended that Fidelity, or its predecessors Lawyers Title and Commonwealth, have the right to maintain an action on the Policy.  None are named as additional insureds.  "Third party beneficiary status depends not so much on a desire or purpose to confer a benefit on the third person, but rather on an intent that the promisor assume a *direct obligation* to him."  **McKenzie**, 931 S.W.2d at 845 (internal quotations omitted).  <u>See also</u> **Realty Res., Inc. v. True Docugraphics, Inc.**, 312

---

[18]There is an exception for negligent misrepresentation.  **Grisamore**, 306 S.W.3d at 574. Such exception has not been argued in this case.

S.W.3d 393, 398 (Mo. Ct. App. 2010) ("It must be shown that the benefit to the third party was the cause of the creation of the contract.") (internal quotations omitted).  The omission of Fidelity, Lawyers Title, and Commonwealth from the list of additional insureds indicates the absence of such intent.  Moreover, Fidelity's argument that it intervened in this action to protect its interests and that Lexington incorrectly asserts that it seeks to recover damages on third-party beneficiary contract claims are further indications that Lexington and Integrity Land/Integrity Disbursing did not enter into the insurance agreement for the primary benefit of Fidelity.

Additionally, as opposed to any inference that Fidelity is a third-party beneficiary of the Policy for any purpose, one of the conditions in that Policy expressly disclaims any intent to benefit a third-party:  "No person or entity shall have any right under this policy to join the [Lexington] as a party to any Claim against the Insured to determine the liability of the Insured, nor shall [Lexington] be impleaded by the Insured or the Insured's legal representative in any such Claim."  (Compl. Ex. A at 14-15.)

Integrity Land's and Integrity Disbursing's Motion.  As noted above, Integrity Land and Integrity Disbursing filed their motion for summary judgment out of time and without leave of Court.  Regardless, having adopted Fidelity's arguments, the motion is without merit.

### Conclusion

It is undisputed that severe losses were sustained by the various parties who sought to hold Integrity Land and Integrity Disbursing responsible.  Those losses, however, are not covered claims under the Policy.  The Gassen claims were not within the policy period.  And,

neither Integrity Land nor Integrity Disbursing timely reported the claims arising from the Bower & Bailey transactions.  Accordingly,

**IT IS HEREBY ORDERED** that the motion for summary judgment filed by Lexington Insurance Company is **GRANTED**.  [Doc. 42]

**IT IS FURTHER ORDERED** that the motion for summary judgment filed by Fidelity National Title, Inc., as successor by merger to Lawyers Title Insurance Corporation and Commonwealth Land Title Insurance Company [Doc. 45] and the motion for summary judgment filed by Integrity Land Title Co, Inc., and Integrity Disbursing, L.L.C., [Doc. 54] are each **DENIED**.

An appropriate Judgment shall accompany this Memorandum and Order.


/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this  13th  day of  February, 2012.